UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |  |  |
|---|---|---|---|
| AUTOMATED CUTTING | ) | | |
| TECHNOLOGIES, INC., | ) | | |
| | ) | | |
| Plaintiff, | ) | No. 5:10-CV-208-REW | |
| | ) | | |
| v. | ) | | |
| | ) | MEMORANDUM OPINION AND | |
| BJS NORTH AMERICA E, INC., | ) | ORDER | |
| | ) | | |
| Defendant. | ) | | |

*** *** *** ***

Defendant, BJS North America E, Inc. (BJS)[1], moves the Court for (1) summary judgment or, alternatively, (2) partial summary judgment limiting Plaintiff's claims for damages and narrowing the issues for trial. DE #54 (Motion). Plaintiff, Automated Cutting Technologies, Inc. (ACT), responded in opposition (DE ##69, 70), and Defendant subsequently replied (DE #71). Having reviewed the filings and the full record under the required standards, the Court **DENIES** BJS's overall motion for summary judgment (DE #54) but does grant summary judgment in part, as detailed below.

## I. Relevant Background[2]

This case arises out of a commercial relationship gone sour. ACT, the seller, is a Kentucky corporation that manufactures/machines metal, wood, and plastic parts to customer

---

[1] Defendant's motion notes that BJS changed its name on December 20, 2010, to Overman, Inc. On June 29, 2011, the company again changed its name to Overman USA, Inc.  Movant states that Overman USA is the same company as BJS. DE #54 (Motion) at 1 n.1.  The Court continues to refer to the company as BJS.

[2] In accordance with Federal Rule of Civil Procedure 56, the Court discusses the facts in favor of Plaintiff, ACT, the non-movant.

specifications. DE #68 (Worley Depo.) at 25. BJS, the buyer, is a Tennessee company that, in part, produces wood component parts for "self-assembly" boxed furniture sold by Swedish retailer IKEA. DE #54-1 (Memorandum) at 1.  In fall 2009, BJS's then-plant manager, Jason Crayne, and ACT's principal, Rodney Worley, began negotiations to establish a relationship wherein ACT would machine parts for BJS, based on BJS's specifications, which BJS would then use in its IKEA lines. DE #69 (Response) at 1.

On October 17, 2009, Crayne prepared, and the parties subsequently signed, a document titled "5 Points for BJS-NAE and ACT."[3] DE #1-2.  Per Crayne, the purpose of the document was "to have the parts necessary . . . so that BJS could comply with its obligations to IKEA." DE #60 (Crayne Depo.) at 8.  According to ACT, the document established a 5-year contract to run parallel to BJS's 5-year contract with IKEA. DE #69 (Response) at 2.

At signing, BJS knew that ACT lacked the capacity to efficiently produce the number of component parts BJS would demand.  DE #69 (Response) at 1; DE #60 (Crayne Depo.) at 9 ("[Worley] said that he would need to purchase machinery and – to get set up to do the parts and so – and that was kind of where we were – that we were fine with that because we needed a narrow parts producer."). Worley, anticipating a long-term relationship, made significant machine investments, often following consultation with BJS.  DE #69 (Response) at 2. Further, in order to run the machines and produce the requisite number of parts, ACT hired additional

---

[3] The document lays out 5 points of the ACT-BJS relationship: (1) BJS required approximately 800,000 component parts ±10%; (2) ACT would follow BJS's quality standards and take responsibility for "inferior quality due to machining/improper materials usage/packaging"; (3) ACT agreed not to use knowledge of the "processes, designs, contacts, and/or materials" to compete with BJS and not to divulge intellectual property absent permission; (4) ACT agreed to meet BJS's component material standards; and (5) the parties agreed to negotiate price agreements for start-up and for high production volumes, agreeing further that BJS would "seek best prices from ACT as they implement best practices to meet maximum efficiencies." DE #1-2 (5 Points).

workers. *Id.* at 1.   At deposition, Worley testified that, sometime around May 2010, he tried to liquidate the plant and received an offer around $400,000.  DE #68 (Worley Depo.) at  23.  He also confirmed that, at the time of deposition, he owed less than $400,000 on the equipment but that he had made a capital outlay of approximately $484,000.  *Id.* at 24, 25.

Given that IKEA required the parties to purchase medium density fiberboard (MDF) from approved vendors with whom ACT had no established credit, BJS purchased MDF on behalf of ACT. The vendors shipped the MDF directly to ACT, and BJS then billed ACT.  DE #54-1 (Memorandum) at 5. Throughout the short relationship, the parties argued over how BJS should be repaid by ACT, as BJS desired to set-off from amounts it owed ACT and Worley, on behalf of ACT, resisted this deduction scenario. DE #68 (Worley Depo.) at 212-14; DE #54-1 (Memorandum) at 5-6.

Cross-payment problems were not the only troublesome issue, however, as BJS also had quality complaints, and ACT raised various order, production, and payment disputes.  ACT and BJS performed under the 5 Points document for 7 months, although at some point BJS determined (unbeknownst to ACT) to phase out ACT. DE #65 (Orlowske Depo.) at 38-40. In deposition, Orlowske attributed BJS's shift to other vendors partly to quality issues and partly to "personality bitterness between the two companies." *Id.* at 39.  Email communications evince the rocky nature of the relationship, which ultimately fell apart in May 2010 following a stream of tense email exchanges between Rodney Worley and Gary Slone, then-BJS's Chief Operating Officer. DE #69-1 (Appendix) at 2-4.  Following Slone's May 14, 2010, email, BJS closed all orders and ceased sending new purchase orders to ACT.  DE #54-1 (Memorandum) at 8.

ACT filed the instant action in Jessamine County on May 21, 2010. BJS timely removed on June 22, 2010. BJS filed the instant motion for summary judgment, ACT responded in opposition, and BJS subsequently replied. The motion stands ripe and ready for review.

## II. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

4

and on which that party will bear the burden of proof at trial." *Celotex Corp.* at 106 S. Ct. at 2552.

A fact is "material" if the underlying substantive law identifies the fact as an essential element. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp. v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## III. Analysis

### A.  Applicable Law[4]

The Uniform Commercial Code applies to transactions in goods.  K.R.S. § 355.2-102. The Code defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." *Id.*  "[W]hether or not Article II of the Code applies is determined by analyzing whether the predominant factor and purpose for the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods with labor incidentally involved." *Wehr Constructors, Inc. v. Steel*

---

[4] The Court is puzzled by the parties' lack of discussion regarding the applicability of the UCC. BJS cites to a variety of common law and pre-UCC authority, *see* DE #54-1 (Memorandum) at 10-15, while ACT summarily states that "Article 2 of the UCC obviously governs this dispute," DE #69 (Response) at 8.

*Fabricators, Inc.*, 769 S.W.2d 51 (Ky. Ct. App. 1988) (citation omitted). In applying this test, the Court finds that ACT sold parts to BJS, and that its machining of (or application of its services to) those parts was incidental to the finished component good, the heart of the parties' relationship.

The 5 Points document centers primarily on an exchange of goods. *See* DE #1-2 (5 Points) (identifying the number of components required and providing some guidance for component quality and material). Crayne confirmed in deposition that the parties executed the 5 Points document so that BJS would have the "parts necessary . . . [to] comply with its obligations to IKEA." DE #60 (Crayne Depo.) at 8. The agreement contains a small services component—ACT had to manufacture the components to BJS (and IKEA) specifications. The relationship ultimately formed so ACT would manufacture component parts for BJS to deliver in finished products to IKEA. *See* DE #68 (Worley Depo.) at 44 (noting that the parties discussed "making parts for BJS"). Thus, although ACT provided its machining services, the end-product—the component part—was the predominant factor of and ultimate purpose for the contract. Thus, the Uniform Commercial Code, as adopted in K.R.S. § 355 *et seq.*, properly applies.

B. *Choice of Law*[5]

When sitting in diversity, federal courts look to the conflict of laws rules of the forum state. *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 61 S. Ct. 1020 (1941)). Kentucky has a strong preference for applying its own law. *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000) (noting

---

[5] The Court is equally puzzled by the parties' omission of any substantive discussion regarding choice of law. BJS briefly addresses the issue in a footnote, ultimately concluding that Tennessee law should apply but further noting that both Kentucky and Tennessee have adopted the UCC. DE #54-1 (Memorandum) at 1 n.1. BJS's Memorandum bounces between Kentucky and Tennessee law, and ACT simply does not address the issue, consistently applying Kentucky law.

Kentucky's "provincial tendency" to apply its own law); *see also Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983) ("Kentucky courts have apparently applied Kentucky substantive law *whenever possible*."). In fact, "Kentucky law will apply to a contract issue if there are sufficient contacts and no overwhelming interests to the contrary, even if the parties have voluntarily agreed to apply the law of a different state." *Id.* (citing *Breeding v. Mass. Indemnity & Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982)).

Kentucky law governs this dispute, which centers on a Kentucky company producing goods in this state.[6]  Given that Kentucky has a presumption for applying its own law and requires a significant reason to displace its application, and recognizing no contrary argument, Kentucky law applies.  K.R.S. § 355.1-301(3);  *see also Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667-68 n.1 (E.D. Ky. 2010) (citing *Williams v. Toys "R" Us*, 138 Fed. App'x 798, 803 (6th Cir. 2005)).

### C. *The Statute of Frauds Limits Enforcement to the Quantity Set Forth in the 5 Points Agreement*

BJS argues an amalgam of KRS § 371.010(7) and Kentucky's UCC statute of frauds, KRS § 355.2-201.  As other courts confronting the issue of dual statutes have held,[7] the UCC's

---

[6] A court need only undertake a choice of law analysis when a conflict occurs and, here, both Kentucky and Tennessee have adopted the Uniform Commercial Code. *See* K.R.S. § 355 *et seq.*; Tenn. Code Ann. § 47-2-201 *et seq.*  The parties making no distinctions, the Court does not screen for identicality.

[7] The Court finds persuasive the weight of the authority not to require satisfaction of both statutes of frauds. *See Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 140-42 (6th Cir. 1983) (applying the UCC statute of frauds not Ohio's general statute of frauds to a sale of goods); *H&W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172 (5th Cir. 1988) (applying Mississippi's UCC statute not the general statute of frauds); *see also AP Propane v. Sperbeck*, 157 A.D.2d 27, 29 (N.Y. 1990) ("We also note that applying UCC 2-201 where it conflicts or overlaps with more general Statutes of Frauds is consistent with the prevailing view in other jurisdictions."); *Rajala v. Allied Corp.*, 66 B.R. 582, 592 (D. Kan. 1986); *Merwin v. Ziebarth*, 252 N.W.2d 193, 197 (N.D. 1977).

statute of frauds controls where it applies.  The Court finds that, as a specific section addressing the requirement of a writing, and the enforceability of that writing, section 2-201 acts to preempt section 371.010.   The latter is "displaced by the particular provisions of the Uniform Commercial Code," K.R.S. § 355.1-103(2), and thus does not apply to transactions in goods. Section 2-201 provides the decisional basis.[8]

Without question, the 5 Points document is a writing, signed by the parties, and reflects negotiated terms relative to a transaction in goods.  The Code calls for a writing "sufficient to indicate that a contract for sale has been made."  K.R.S. § 355.2-201(1).   While a jury will have to determine much of what the parties intended, the 5 Points document contains an explicit quantity range, deals with quality and materials, protects intellectual property, and specifies some price mechanics.  The statute aims to prevent fraud, and the document here adequately would support a finding that the parties indeed did make a contract for sale.

However, while the Code can fill many textual gaps from nontextual sources, including via parol evidence, section 2-201 makes quantity a mandatory term for contracts exceeding $500.00:  "A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."  *Id.*  Thus, even though ACT may have proof that the 5 Points document underlays a contract to provide a yearly need of BJS to parallel the full 5-year IKEA-BJS relationship, the writing omits any durational reference.  Such an omission is not fatal to finding and enforcing a contract, but it does limit ACT to the quantity stated in the writing.  ACT points to no writing

---

[8] Thus, section 2-201 does not contain or require the one year performance rule built into K.R.S. § 371.010.

that enlarges the quantity beyond that contained in point 1 of the 5 Points document, and section 2-201(1) explicitly caps enforcement at the stated, agreed upon level.

### 1.    Section 2-201(3)(a) Does not Apply  to Open the Durational Term

Subsection (3)(a) of section 2-201 is an equitable exception to subsection (1), preventing an unfair result under particular circumstances where an adequate writing does not exist.  Per that section:

> A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable (a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement[.]

K.R.S. § 355.2-201(3)(a).   ACT attempts to use this section as a vehicle for enforcing the full putative contract.  The Court finds, however, that ACT cannot use its efforts in the first several months of actual performance to validate enforcement of a 5-year alleged quantity.

The language of the exception, as relevant, focuses on changes in reliance related to particular (specially manufactured) goods.  It applies only to pre-repudiation manufacturing or procurement steps.  The subsection specifically references a substantial beginning of their [*i.e.*, the goods'] manufacture.   ACT would extend the notion of substantial beginning to the acquisition of equipment.   The Court does not here equate preparation to manufacture (*e.g.*, capital improvements, personnel decisions) with the beginning of manufacturing itself. Purchasing of raw materials is its own sub-category, which signifies that preparatory steps are not part of the process of manufacturing as referenced in (3)(a).

9

Further, this case features a writing upon which ACT can seek recovery. Subsection (3)(a) aims at situations where a contract "does not satisfy the requirements of subsection (1)" of section 355.2-201. The Court already endorsed the writing as adequate.

At the time of repudiation or cancellation, ACT here had manufactured less than one-half of the stated quantity (and a minor fraction of the "millions" of parts a full 5-year claim would encompass). ACT had manufactured (or even begun to manufacture) none of the parts falling into the unwritten portion of the contract—those exceeding the 720,000 to 880,000 range. Finally, as to the equipment purchases, it is significant to note that ACT planned to and ultimately did amortize its related equipment purchases over the stated quantity—not the putative five-year duration. *See* DE #68 (Worley Depo.) at 56 ("I wanted to amortize the cost over the first year and this was the reason a quantity was put in there was to give me some assurances on the quantities that would be done the first year."); *id.* at 177 (discussing first year amortization and expected profit).

Cases applying the "substantial beginning" exception have limited the scope of subsection (3)(a) to goods in process, rejecting partial production and/or prototype creation as the basis for treating an entire claimed contract as spared by the section. *See Epprecht v. IMB Corp.*, 36 U.C.C. Rep. Serv. 391 (E.D. Pa. May 25, 1983); *Chambers Steel Engraving Corp. v. Tambrands, Inc.*, 895 F.2d 858 (1st Cir. 1990); *EMSG Sys. Div., Inc. v. Miltope Corp.*, 37 U.C.C. Rep. Serv. 2d 39, 44 (E.D.N.C. 1998); *Vision Sys., Inc. v. Emc Corp.*, No. 034305BLS, 2005 WL 705107, at *6 (Mass. Super. Feb. 28, 2005) (quoting *Epprecht*, "The quantity of goods to be produced under a contract is a critical term," and then refusing to treat production of 1,247 units as the "substantial beginning" of 5,653 other units "that were not actually manufactured"). Although all commentators may not agree with the interpretation in these cases, the Court cannot

find that completing 30% of an expressly stipulated initial quantity should qualify as substantially beginning manufacture of goods in putative years 2-5 of a contract. The manufacture of goods in the seventh month of the agreement is no more probative of years 2-5 than it is of the initial and expressly agreed 800,000±10% parts figure.

In sum, the Court finds that section 2-201 bars enforcement except as to the quantity stated in the 5 Points document. The Court thus **GRANTS** summary judgment to Defendant insofar as it limits the quantity upon which Plaintiff may recover to the stated range in the written document.

**2.     A Jury Must Determine the Parties' Intent to be Bound for the Stated Quantity.**

BJS contends the 5 Points document is nothing more than an "agreement to agree." This is a plausible but nonexclusive take on the evidence of record. Certainly, there is sufficient evidence of a properly formed contract to submit to a jury for determination.

In the UCC context, contract formation rules are less rigid than at common law. The Code requires only that the contract be made in a "manner sufficient to show agreement." K.R.S. § 355.2-204(1). The terms are adequately definite, even if some remain open, as long as there appears "a reasonably certain basis for giving an appropriate remedy." *Id.* § 355.2-204 (3). Evidence of prior, contemporaneous, and prospective interactions can explain or supplement even a final writing, *id.* § 355.2-202, and even the precise time of contract formation need not be determined. *Id.* § 355.2-204(3).

Here, ACT offers sufficient evidence of a valid and enforceable agreement built around the 5 Points document. The Court already has found the document a valid "writing" under the

Code.  Through competent oral proof that simply explains the 5 Points document, ACT provides

the following:

    a.  Worley specifically testified that BJS promised the stated parts requirement during the first year:  "We were promised that that first year we would make the 800,000, plus or minus, parts and that they expected it to go for at least five years."  DE #68 (Worley Depo.) at 118; *id.* at 55 (discussing point 1 of 5 Points document and stating "That we were going to make 800,000 plus-or-minus ten percent parts for the first year.").

    b.  That the ACT-BJS deal mirrored in part a long-term contract between BJS and IKEA is surely a reasonable inference.  The IKEA contract "was there."  DE #60 (Crayne Depo.) at 7.  Crayne, who drafted the 5 Points Document, agreed that the purpose of document execution was "to have the parts necessary to be able so that BJS could comply with its obligations to IKEA."  *Id.* at 8.

    c.  BJS expressly considered the ACT relationship as fulfilling part of its need regarding IKEA.  Per Kaj Johansson, "The 800,000 components was based on our forecast with IKEA and it was a yearly need."  DE #63 (Johansson Depo.) at 20.   The IKEA contract had a 5-year term.  *Id.* at 53-54.

A jury must assess here whether the parties intended the 5 Points document to be binding

or advisory—there is a genuine dispute over the parties' intent in that regard.  Based on the

negotiations and profit margin limitations imposed by IKEA, the Court believes, at this stage,

that a valid remedial basis would exist as to any proven breach.

However, the Court is concerned about the open price term, something the jury must

address.  An open price term is not necessarily fatal, assuming the parties agree on such

openness.  Section 355.3-205 specifically governs the requirement of price.  Per that section:

"(1) The parties if they intend can conclude a contract for sale even though the price is not

settled."  K.R.S. § 355.3-205(1).  The Code fills the gap, if there is one, with a reasonable price.

*Id.*  Still, the parties must intend to be bound despite the price term open.  Subsection (4) states:

"Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is

not fixed or agreed there is no contract."  *Id.* § 355.3-205(4).

Here, there is conflicting evidence. The 5 Points document expressly anticipates future price negotiations: "Price agreements will be negotiated for start-up and for high production volumes." DE #1-2 (5 Points Document) ¶ 5. This reflected anticipated efficiencies that would result from ACT's process and equipment progressions. *See* DE #63 (Johansson Depo.) at 57 (discussing expectation of 5%-7% profit margin, a pass-through limitation from IKEA). ACT and BJS did (almost always) successfully negotiate pricing over the course of seven months.

However, the record raises a substantial, if isolated, question about whether the 5 Points document actually bound BJS to purchase. Worley described the circumstances surrounding a bid from ACT that BJS found too high; BJS ultimately rejected the bid:

> Q:    His refusal to purchase those items from you because they were too expensive, is that inconsistent with your personal interpretation of the 5 Points document?
>
> A:    No.

DE #68 (Worley Depo.) at 202-03. Worley earlier had testified that the agreement would require further negotiations if price became an issue:

> Q:    What would happen if you couldn't agree on price? Was BJS still required to purchase components from ACT?
>
> A:    They would have to do something. They knew what we were doing and they'd already seen a good bundle of pricing.

*Id.* at 59. A jury must assess whether the open price term meant that the parties did not enter into a binding commitment or that the parties were bound and would reach agreement on the 800,000 parts through an interactive process. In other words, the rejected bid could suggest that BJS had freedom **not** to deal with ACT or, alternatively, it could suggest that those particular

13

parts were not necessarily within the 800,000 requirement.[9]  It is not clear whether that was a lone instance of disagreement in a field of proposals otherwise resulting in production.  The document language and course of performance would, at this stage, create factual disputes on the open price term and its effect.[10]

### D.  A Requirements Contract?

BJS also alleges that the 5 Points contract is a requirements contract, which permitted it to make good faith reductions in its quantity requirements pursuant to K.R.S. § 355.2-306(1). DE #54-1 (Memorandum) at 19. ACT responds that the contract is not properly construed as a requirements or output contract because (1) ACT bargained for a specific minimum quantity, (2) BJS did not purchase exclusively from ACT, and (3) even if the Court construes the 5 Points contract as a requirements contract, any good faith reduction is a jury question. DE #69 (Response) at 30-38.  In reply, BJS argues that ACT misunderstands the nature of exclusivity, reiterating that Worley's "angry emails" had the effect of discharging BJS from future obligations to ACT.  DE #71 (Reply) at 12-13.

---

[9] BJS does not cite, and the Court does not evaluate, any effect KRS section 355.2-309(2) might have.  That segment deals with a contract of indefinite duration but successive performances, making the deal terminable after a reasonable time.  *See* K.R.S. § 355.2-309(2).

[10] The Court rejects promissory estoppel as an alternative theory.  Worley specifically testified to no promise of orders beyond year one.  DE #68 (Worley Depo.) at 118 ("Q: Did anyone at BJS ever guarantee you orders after the first year?  A: Nobody said, Rodney, I guarantee.").  Further, and most significantly, the Kentucky Supreme Court has limited the theoretical reach of promissory estoppel (and even equitable estoppel), relative to avoidance of the statute of frauds, to employment and other "extreme" scenarios.  *Sawyer v. Mills*, 295 S.W.3d 79, 90 (Ky. 2009) (limiting *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 471 (Ky. 1999), to employment and noting equitable estoppel limit to "most extreme circumstances"); *Trim v. Merv Props., LLC*, 2011 WL 1327589, at *3 (Ky. Ct. App. 2011).  An arms-length commercial dispute between merchants, centered on a negotiated writing, would hardly appear to qualify as an extreme circumstance, and Plaintiff provides no authority for extending this equitable doctrine into such a category of dispute.

"Requirements contracts generally arise in situations where a unit price can be determined but the total quantity of units cannot. Even in that situation, the obligation to supply or to buy units is not unlimited, but is subject to the notion of 'reasonable proportion.'" *A&A Mech., Inc. v. Thermal Equipment Sales, Inc.,* 998 S.W.2d 505, 512 (Ky. Ct. App. 1999) (quoting *Empire Gas Corp. v. Am. Bakeries Com.*, 840 F.2d 1337 (7th Cir. 1987)). In *Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465, 467-68 (6th Cir. 1989), the Sixth Circuit upheld a finding of a requirements contract. In *Cyril Bath*, the seller sued the buyer for breach of contract, and the seller argued that the contract was not properly construed as a requirements contract because the buyer "did not promise to purchase tubes exclusively from [the seller]." *Id.* at 467.  The contract did, however, detail a quantity to be purchased over a three-year period.  "A promise to purchase exclusively from one seller may be either implicit or explicit." *Id.* (citing *Brem-Rock, Inc. v. Warnack*, 624 P.2d 220 (1981)). As in the instant case, the seller in *Cyril Bath* knew the buyer was producing for a third-party. The court thus found an implicit promise based on the seller's knowledge of the buyer's needs in producing for the third party and of the quantity detailed in the contract. The Sixth Circuit also found an explicit obligation to buy: the buyer "was explicitly obligated under the agreement to purchase its tubes from [seller] at least up to the number specified, subject to the good faith variation in the buyer's requirements." *Id.*

Here, ACT knew that BJS ordered component parts based on orders BJS received from IKEA. Although the 5 Points document did not specify amounts over a period of years, the first point provides a quantity that BJS would require from ACT (approximately 800,000 ±10%) in year one.  Official Comment Three to UCC section 2-306 provides:

> If an estimate of output or requirements is included in the agreement, no
> quantity unreasonably disproportionate to it may be tendered or demanded.
> Any minimum or maximum set by the agreement shows a clear limit on the

> intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

UCC § 2-306 cmt. 3. Here, the terms of the 5 Points writing sets an estimate and a specific range for variation. Thus, Court finds that the ±10% could be a "clear limit on the intended elasticity." A jury will assess whether the parties intended the agreement to be one measuring BJS's purchase duty by its actual requirements, bounded by the negotiated elasticity. The evidence suggesting a non-exclusive relationship cuts against finding a requirements contract—by definition, the measure of such a contract is the buyer's actual requirements concerning a particular good. Multiple suppliers would violate the principle of the buyer's requirements setting quantity as to one vendor.

In any event, as to summary judgment, even if a requirements contract, there would be a genuine dispute. Under a requirements contract, the buyer must order from the seller "such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded." K.R.S. § 355.2-306(1). In alleging breach of a requirements contract, "[t]he seller bears the burden of demonstrating bad faith." *Wiseco, Inc. v. Johnson Controls, Inc.*, 155 Fed. App'x 815, 818 (6th Cir. 2005) (citing *Technical Assistance, Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998)) (applying Kentucky law).

Here, ACT alleges sufficient facts to create a genuine dispute of material fact over whether any reduction taken by BJS was made in good faith. Although the parties may have intended to form a long-term relationship, the 5 Points document reflects only a requirement of about 800,000 parts and is silent on both additional quantities and any term of years. BJS

maintains that "there is no evidence that BJS wanted out of its supply relationship with ACT until Rodney Worley unilaterally changed two material terms." DE #54-1 (Memorandum) at 22. Email correspondence from BJS, however, indicates that BJS closed open ACT purchase orders weeks earlier. Further, BJS had already decided to phase out ACT, and its motive was arguably personal. *See* DE #65 (Orlowske Depo.) at 39 (noting March 2010 directive to "terminate the orders that were going to ACT" and attributing cause both to product quality and "bitterness between the two companies"). This is not a decision driven by a change in requirements but rather by conflict between customer and vendor. A fact question thus exists regarding whether BJS made a good faith reduction or acted in breach. In light of the alleged quality issues and the content of the email communications the parties exchanged on May 13 and 14, 2010, a jury must evaluate the effects of BJS's actions relative to order reduction/cessation.

### E. Termination or Repudiation

BJS also argues that Worley's demand to change payment terms, as set forth in his May 13, 2010, email, "can only be viewed as 'termination' by [ACT], relieving BJS from any liability for 'breach of the whole contract or any unperformed balance.'" DE #54-1 (Memorandum) at 16. Alternatively, BJS argues that Worley's actions amounted to contract repudiation. ACT responds that Slone actually terminated or repudiated the contract first, via Slone's May 13 and 14, 2010, emails. DE #69 (Response) at 16-20. ACT argues that Worley intended to continue performing under the contract, and that Slone's reference to unilaterally closing purchase orders was anticipatory repudiation or termination. *Id.* ACT further alleges that it corrected alleged quality issues months prior to the May exchanges, and that BJS's repudiation was unjustified. *Id.* Thus, according to ACT, Worley's email addressing payment mechanics was a proper demand for adequate assurance under the UCC and genuine disputes of material fact exist over which party

17

repudiated first or properly. *Id.* In reply, BJS reiterates that ACT's demand for cash on delivery payment was unreasonable. DE #71 (Reply) at 11.

On May 13, 2010, Worley emailed Slone that he was "firm on [his] terms of **CERTIFIED** funds for payment on shipments." DE #69-1 (Appendix) at 4. Further, "[a]s I do not feel that BJS has acted in good faith and due to the history of BJS attempting to change any agreement as well as delaying or reducing payment every time one is due, a certified check for $23,122.34 is required **prior** to shipment of these parts." *Id.*

On May 13, 2010, Slone responded via email, refusing to issue ACT a certified check. *Id.* at 3. Slone further informed Worley that BJS did not have "any open purchase orders for any product from any supplier," and that BJS had closed the purchase orders Worley referenced. *Id.* Worley responded that same evening: "The history of BJS, its many past managers, owners and your personal history of not keeping your word demands certified check. This is not negotiable." *Id.* at 2. Worley inquired further about the purchases orders, asking Slone when they had been closed and when Worley had "agreed" to the closings. *Id.* at 2-3. Slone replied to Worley's email on May 14, 2010:

> As for open purchase orders, there are none. I instructed our former purchasing agent to close those weeks ago. If for some reason, you have not complied, please do so.
> I do not intend to negotiate with you on mode of payment, certified or otherwise. We both agree you need to move on to other customers. . . . My last correspondence with you will be the list of unusable parts produced at ACT and when you can pick those up.

*Id.* at 2.

The May 13-14 email exchanges clearly do not tell the whole story; the Court finds a genuine dispute of material fact about the etiology of the agreement's end. Here, the parties

changed (and threatened to change) terms **throughout** their relationship.  Over a month earlier, on April 9, Worley emailed BJS that

> As of today your account is prepay. I will not ship product until payment has been received. In addition there will be no further shipments to BJS until your account is paid in full, all the daybeds that have been produced are paid for and remedies for tooling and custom machines for Hemnes is resolved.

*Id.* at 39. This email followed Worley's March 18 email, which, in part, states:

> Not a single promise that has been made has been kept therefore I am considering the following ***temporary*** actions until such time as I feel secure with the management and financial stability of BJS.
>
> 1   Creating a credit limit of $50,000.00 US that shall be enforced.
> 2   Holding shipment of Birkland BST bottom rails and doors until this is resolved.
> 3   Shipments will not be made that cause BJS to owe ACT more than that amount until the balance is paid down.
> 4   Reevaluating our prices considering the lower volumes and lack of forecasting at BJS. Every shipment can not be an "emergency 'need ASAP'" shipment and be expected to be billed at a high volume discount rate. I need PO's 2 to 3 months in advance.
>
> I am open to alternatives to these actions if you can make me feel secure. But I honestly have no idea what alternatives could possibly do this considering the past.

*Id.* at 35.

The bad blood and troubled relationship in this case came to a head on May 13-14, 2010, but the parties clearly contemplated changing, and in fact did change, terms prior to that time. *See id.* at 22 (series of emails from November 2009) (discussing payment terms, noting that payment terms had been changed to either net 10 or net 20 for a period and would revert back to net 30); *id.* at 25 (February 15, 2010 email from Worley to Johansson and Lidaker) (stating that BJS demanded net 60 and that BJS told ACT, "BJS has additional parts that could be sent to ACT to run, but BJS has vendors that will give 60 day terms so the parts go to them); *id.* at 25

(indicating that BJS had told Worley to "cancel [his] second shift" and that BJS would not be honoring the original volume agreement). Further, prior to May 13, 2010, BJS agreed to purchase parts COD.  DE #69-1 (Appendix) at 5 ("This will clear both our accounts and we will buy the other parts you have in inventory COD.").

The record indicates that BJS continued to send mixed messages to ACT as late as April 15, 2010. BJS expressed its desire to continue a relationship with ACT, s*ee id.* at 28 (April 15 email from Lidaker to Worley) ("We aim to be in for the long run. The two of us still want to have you with us."), but nevertheless reduced order quantity and paid late.  Critically, BJS appears to have determined, at least internally, to cease ordering from ACT. *See* DE #65 (Orlowske Depo.) at 38 ("The gist of the conversation [with management] was . . . to not give no more purchase orders, but to start looking for better sourcing and manufacturing and try to phase him out."); *id.* ("[N]obody told me not to order from [ACT]. They said we need to just start phasing him out and using other vendors."). A jury must determine the propriety of each party's behavior at and leading to the death of the deal.

KRS § 355.2-106(3) defines termination as occurring "when either party . . . puts an end to the contract otherwise than for its breach." KRS § 355.2-106(3). Further, "[t]ermination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party." *Id.* § 355.2-309. Here, both sides finger-point on the question of termination, arguing that particular actions ended the contract, and neither party alleges any form of reasonable notice. Simply put, a jury must assess whether any event in the parties' course of performance, including the long string of changes and demands, served to terminate the contract on or before May 13, 2010.

Factual disputes also arise over whether either party anticipatorily breached the contract. "Whether a contract has been anticipatorily repudiated is a question of fact." *Upton v. Ginn*, 231 S.W.3d 788, 791 (Ky. Ct. App. 2007) (citing *Leibson & Nowka*, *The Uniform Commercial Code of Kentucky* § 2.06(2) (3d Ed. 2004)). Anticipatory repudiation centers "upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.'" *Id.* (quoting UCC § 2-610 cmt. 1 (1958)). The communication constituting the anticipatory repudiation must be "unequivocal." *Brownsboro Rd. Rest., Inc. v. Jerrico, Inc.,* 674 S.W.2d 40 (Ky. Ct. App. 1984).

BJS alleges that ACT did not make a reasonable demand for adequate assurance because Worley's demands were not commercially reasonable under § 355.2-609(1). DE #54-1 (Memorandum) at 18. Essentially, BJS argues ACT had "no reasonable grounds for insecurity" because (1) ACT owed BJS money and (2) ACT had shipped damaged parts. *Id.* ACT responds that the parties' course of performance gave Worley the right to demand adequate assurances. DE #69 (Response) at 20-29 (detailing how BJS demanded offsets, failed to pay invoices as they became due, changed payment terms from net 30 to net 60, refused to accept delivery, and demanded a 100% conformance rate). In reply, BJS maintains that "Worley's material change in the course of dealing discharged BJS from future performance under his new terms, of which no reasonable buyer under similar circumstances would agree." DE #71 (Reply) at 12.

A jury must decide who ended the relationship and why. Although Worley's May 13 email does demand new payment terms, BJS had previously agreed to pay COD. Further, Slone's response email indicates BJS's unwillingness to go forward with any further purchase orders, and Worley's email indicates that ACT was prepared (and expected) to continue filling orders.  A jury could assess ACT's posture as commercially unreasonable, but it also could view

21

ACT as well-justified in requiring payment on or prior to delivery.  BJS had been less than compliant with payment terms and had unilaterally imposed a set-off system relative to raw materials.  Had BJS paid on delivery, it would have retained its legal right to inspection and a remedy for nonconforming goods.  KRS § 355.2-512(2).  BJS is not entitled to summary judgment on the issue of breach or repudiation.

  *F.   Plaintiff's Right to Recovery*

  BJS also seeks to limit ACT's recovery, alleging that ACT's history of financial loss precludes recovery for lost profits. DE #54-1 (Memorandum) at 22. ACT argues that it can recover lost profits under both the UCC and Kentucky common law. DE #69 (Response) at 38-41. BJS maintains its argument in reply. DE #71 (Reply) at 13-14.

  In Kentucky, damages for breach of contract "must be proven with reasonable certainty." *Advanta USA, Inc. v. Farmers Fertilizer Co., Inc.*, No. 2005-CA-662-MR, 2006 WL 1561489, at *3 (Ky. Ct. App. June 9, 2006) (citing *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky. 1985)). Further, "'the loss of anticipated profits may be recovered when they can be legally ascertained, and when there is no lack of certainty on account of being too remote, conjectural, and speculative.'" *Id.* (quoting *Kentucky Utilities Co. v. Warren Ellison Caf*, 21 S.W.2d 976, 978 (Ky. 1929)). In addressing that standard, the Kentucky Supreme Court has said

> Mere uncertainty as to the amount will not preclude recovery. There must be presented, however, sufficient evidence on which a reasonable inference as to the amount of damage can be based. In providing a claim of loss of profits of an established business, the record of past profits is usually the best available evidence. Mere "estimates" of witnesses will not serve, if books were kept. McCormick states: "Opinions of witnesses as to the amount of profits that would have been gained are not admissible, except where the opinion is that of an expert [b]ased upon relevant facts.

*Illinois Valley Asphalt, Inc. v Harry Berry, Inc.*, 579 S.W.2d 244 (Ky. 1979) (internal citations omitted). K.R.S. § 355.2-708 provides the overlay for the contract at bar. Subsection two provides,

> If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (KRS 355.2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

K.R.S. § 355.2-708(2).

BJS hinges its argument relative to lost profit on allegations that ACT was not a new business, although ACT counters that it undertook a new venture with BJS because it had previously manufactured wide, not narrow parts. ACT has hired an expert, Calvin Cranfill, to assess loss.  In *Illinois Valley Asphalt*, the only evidence presented was the "guess estimate" of a lay witness. *Illinois Valley Asphalt*, 578 S.W.2d at 245. Here, however, ACT is (seemingly) prepared to present more than guesswork.[11]  *See* DE 69-1 (Appendix) at 53-58, 62-65, and 71-78 (Cranfill's estimates detailing economic damages) As the Sixth Circuit has said,

> Basically, the law in Kentucky requires a trial court to look at the evidence presented on a case-by-case basis and determine whether a jury can make a reasonable inference as to the amount of lost profits.

*Concrete Materials Corp., Inc. v. C.J. Mahan Const. Co.*, 110 F.3d 63, at *5 (6th Cir. 1997) (table).  On this record, the Court cannot say that limiting ACT's damages as a matter of law is appropriate. ACT alleges more than mere guesswork, and a jury must assess the reasonableness of the claims and methodology.

---

[11] The Court notes that BJS has filed a motion *in limine* to exclude Mr. Cranfill's testimony (DE #87). The Court will address BJS's motion at a later date.

The Court also notes, as a fundamental matter, that the normal contract remedy is the benefit of the bargain.  *See* K.R.S. §§ 355.2-708 - 2-709.  That may capture the idea of contractual profit and really tracks the particular bargain (not the overall profitability of the business).  Here, if Plaintiff prevails, its remedy likely would flow through the lost bargain.  The Court is not convinced that ACT's overall profit history is any bar to the appropriate UCC remedy.

## IV. Conclusion

Therefore, for the reasons discussed above, the Court **ORDERS** as follows:

(1) The Court **DENIES** Defendant's Motion (DE #54) but **GRANTS** summary judgment to the extent Plaintiff's recovery would be limited to the quantity stated in the 5 Points agreement (800,000 component parts ±10%);

(2) The Court **GRANTS** the motion for a scheduling conference (DE #90) and **SCHEDULES** a telephonic Scheduling Conference for **August 2, 2012, at 10:00 a.m.**  The Court will address the Pretrial Conference and Trial dates;

(3) Parties shall file responses to pending motions *in limine* **on or before August 14, 2012**; replies are due **on or before August 22, 2012**;

(4) The Court will provide a court reporter for the August 27, 2012, telephonic conference;

This the 12th day of July, 2012.



Signed By:

**Robert E. Wier**

**United States Magistrate Judge**